Thank you, Your Honors. Our fifth case of the morning is Appeal No. 222236. Dennis Bakke v. Commissioner of Social Security. May it please the Court, good morning. Dana Duncan on behalf of Dennis Bakke. This case is as factual as any case that I've ever argued before this Court. And I'm going to probably indicate right off the bat, if the decision had been rendered in the summer or early fall of 2019, the judge did everything correctly. The problem comes in that it does not reflect the entire record. In this particular case, we had a myelogram that showed that he had renewed stenosis. I'm not a doctor, but I'll try to work through this. He had multilevel fusion. He was noted progress. He said he was feeling better. He started undertaking certain activities, but then it kept getting worse and worse. And then, ultimately, they did an EEG, which showed some abnormalities. And then, subsequently, a myelogram that showed that he had stenosis in the very areas where the fusion occurred. And after some research and using of medical journals and the Mayo Clinic website, it appears what ended up happening is he developed osteophytes over his fusion hardware. And that is what is causing the stenosis. His doctor, as a result of this, limited him to part-time work. And, as a result, he would qualify at his stated age for disability benefits. So to put this on the timeline, Mr. Duncan, that you're starting with, you're saying that in either sometime in 19 or 20, the stenosis developed, and this is what Dr. Andrea Peterson diagnosed? Correct. Is that where we're at on the timeline, though? Correct. While he was in recovery, he had not been released from work, and then, all of a sudden, he started having these problems, and they kept getting worse. He went out for a consultation to a doctor. The records aren't really there saying what the consultation was, but they did not recommend further surgery because what surgery is going to be available? I mean, we're talking about the potential of taking out the hardware or trying to remove osteophytes from the hardware. So there just wasn't an option. The problem comes in that if, on this record, he had walked into my office with everything perfectly laid out, I probably would have recommended filing a new application. But he has a date last insured that expired before the ALJ's decision, and he has no opportunity to file another claim for Title II unless he goes back to work and earns enough credits to extend out his date last insured. So it's ultimately, and this, the judge never addressed the myelogram. It's never mentioned in the decision. It's not discussed. So it's either one of two things. Either the judge ignored it, which is contrary to the precedent of this court, or the judge interpreted it and said it doesn't have any bearing or any meaning, which is also contrary to the precedent of this court. Mr. Duncan, the record shows that Dr. Dukosky saw the myelogram, but he didn't recommend anything after reviewing the myelogram. He didn't say you should have any follow-up scans. There wasn't anything. So how does the myelogram undermine what's in the record prior to the time? It's for the simple fact that it's Dr. Peterson who was actually overseeing it, and he didn't have any recommendations other than to review it, but Dr. Peterson did. I mean, it's his silence, I don't know what you can interpret. Is his silence that he doesn't think there's a problem? Well, the myelogram itself said that there was spinosus and outlined the specific findings, and then the doctor who is treating him and overseeing his care at this point, Dr. Peterson, says, yeah, this is the problem, and the judge says her opinion is unsupported by the record, yet she repeatedly points to this myelogram in the decision and writes into the checkbox form information about the myelogram, and it's never addressed by the judge. Instead, the judge relies on a bizarre, and I'll use that term, record from early in 2020, where if you look at the nurse practitioner who had been doing his follow-up here, she's talking about him reporting pain, having to have stronger pain medications, having all this, and then there's this one entry where it's talking about him farming and going out and doing, tapping trees for syrup, and then the next entry from that same provider goes back into going about how bad his back is. It's just this one entry that just seems like an oddity, and where it came from, I don't know, but that's the record, and that's the one that the judge pointed to as saying that his condition was not as severe as it really was, and it's just an abnormality. The judge didn't outline any of the case law, or excuse me, any of the medical records before or after this entry, just focused on that one date. The record, as I laid out in my reply brief, shows he sold his farm like a year and a half before this date, so the idea that he's farming, I don't know where I had asked him that question. He said, no, I don't know where this came from at all, and it's inconsistent with what I read. Now, this raises a question that probably should have been addressed, and that is, if the judge really felt that record was a credibility issue, he had a duty to make inquiry under SSR 16-3P, and ask about it, and deal with it, and ask for an explanation from Mr. Bakke as to what this record is or what it means. But ultimately, this case comes down to the simple fact that everything hinges on the judge's handling of that myelogram. And on that point, that's where the case rests. It was the basis for denying Dr. Peterson's opinion. It was the basis for finding him to not be as credible. Other than that, I guess I can't say anything more. I will reserve my remaining time, unless there's any questions. Okay, very well. Thank you, Mr. Duncan. Ms. Cohen, good morning. Good morning, Your Honors. Good morning, Your Honors. My name is Emily Cohen, appearing on behalf of the Acting Commissioner in this case. Your Honors, I'd like to directly go to a point that Mr. Duncan just raised, that the ALJ did not address that myelogram from August 2019. And that's just simply incorrect. At page 21 of the record, the ALJ addresses it explicitly. Now, he does refer to it as an MRI, and we note in our brief that that is incorrect terminology. But there was no other test at that time with those findings. So the judge must have been referencing the myelogram to say that the ALJ ignored evidence after the summer of 2019 is simply incorrect. But the ALJ, as we noted, did not interpret that evidence as a layperson, rather correctly relied on the interpretations from Dr. Dukowski and Dr. Peterson. Now, as we noted, Dr. Dukowski did not make any recommendations after that scene at myelogram and characterized it as stable, noting the fusion was still in place. It's clear he saw the report on the myelogram, am I right? Dr. Dukowski, Your Honor? Yes. Yes, Your Honor. Let's see. There's a page. I believe it's 637 in the record. Dr. Peterson also reviewed that myelogram. Dr. Peterson was the one who ordered it. And it is true that Dr. Peterson talks about those findings in several of her treatment notes. But as the district court found, simply reciting those findings in Dr. Peterson's treatment note made no indication that she was relying on those findings to draw her opinion. Moreover, in subsequent examinations with Dr. Peterson, Mr. Bakke then said that his pain was rated as a 3 out of 10. And his examination with Dr. Peterson in June of 2020 was nearly entirely normal. And Dr. Peterson did not recommend any treatment other than medication injections and physical therapy, all of which this court has characterized as conservative treatment in Prill v. Kijikazi. So like this court's recent decision in Durham, which is instructive here, the ALJ relied on the doctor's interpretations of the test results, not the ALJ's own lay interpretations of the test results. Ms. Cohn, can I tell you a question that I have on my mind from reading this a little bit? It's not, what I wondered about with the RFC, the light work determination, was whether it's deficient for not being accompanied by some sit-stand limitations. So in other words, even if you're correct that the light work determination is supported by substantial evidence, at a more granular level, what I wondered about is whether he did show sufficiently that he just can't work an ordinary 8-hour day without some accommodation on sit-stand. And I'm not seeing either party really talk about that. There are some things in here, you know, the standard stuff, he can't climb ropes and ladders and stuff like that. But when I read the ALJ's opinion, one of the things that seemed to stand out to me, and you can correct me if I'm wrong, and I might be, okay, is that Dr. Peterson thought that, or observed, that he really does need to alternate between sitting and standing. These are not made-up back problems, I mean, he's got some serious back issues here. And then it looked to me like, I don't know, maybe the combination of Drs. Young and Nimagata thought that there needed to be some postural limitations. And then, of course, you have the claimant himself that is testifying about the difficulty he's experiencing with walking, standing for long periods of time. So that's the question I have. Well, Your Honor, I would submit that when the ALJ evaluated Dr. Peterson's opinion, the ALJ outlined multiple reasons why the opinion was not persuasive, and including in that opinion was the opinion that Mr. Bakke needed to alternate between sitting and standing. The ALJ was not required to individually discuss the persuasive value of each and every limitation in Dr. Peterson's opinion, but substantial evidence did support his determination that the opinion as a whole was not persuasive, including the sit-stand option. Yeah, and that's, if you're right, the last point you made is the key one. Where I thought the problem with Dr. Peterson is the ALJ just thought the overarching conclusion is problematic, coming from Dr. Peterson. In other words, Dr. Peterson's the one that filled out that form, right? I don't know what that thing's called, ability to work form or whatever, that way, and said, I don't think he's capable of working, and then offered the opinion he can only work four hours that way. Okay, I understand discounting that, you know, under the standard of review under which we're operating, but what about a limitation? What about some kind of sit-stand limitation? Because I looked at this, and I, maybe Mr. Bakke can work an eight-hour day doing light work, maybe sedentary work, I don't know. But it does seem like he's going to need some ability to adjust sitting and standing, given the back problems. And, Your Honor, that's a fair assessment, but neither Drs. Young or Nimagata addressed or thought a sit-stand option was required. And Mr. Bakke's own testimony- Is that different than postural limitation? It may be, I don't know. It is, Your Honor. Yes. Sit-stand would simply be the alternating between sitting and standing, whereas postural is climbing, stooping, kneeling, crawling. Are these terms of art, like in the- They are, Your Honor, yes. All right, okay. Yes. And those terms are defined in SSR 8310, as well, as the non-exertional limitations. Didn't they say he could sit for six hours of an eight-hour workday? Correct, Your Honor. And was that limitation incorporated in the RFC? In the RFC? Yes, Your Honor. So sitting, or excuse me, standing for six hours out of an eight-hour workday is equal to light work, as is defined in the regulations, 404-1567B. Oh, it's built into the regulatory definition of light work? The amount of standing in a total day, yes, Your Honor. And SSR 8310 also goes into greater detail on the standing requirements of light work. To address the point that plaintiff, I'm sorry, plaintiff's activities or the ALJ overemphasized statements that Mr. Bakke made, excuse me, about his activities to Ms. Zellner at page 644 of the record. The suggestion that those statements stand alone is simply not true. As we say in our brief, it actually coincides with many differing statements that he made to his physical therapist and other doctors, that he was at one time riding a tractor or hunting deer or snowshoeing and tromping through the woods in deep snow. These are very robust activities for someone to undertake after they've had effusion surgery. And as far as the argument that the ALJ had a duty to inquire about that statement, that is true, but the ALJ did so at the hearing. Mr. Bakke discussed at length his activities and what he could do at the hearing. So there was no ambiguity in the record. And while the ALJ may not have addressed every single one of those limitations in the decision, the fact that Mr. Bakke made inconsistent statements in his testimony at the hearing and inconsistent with the statements he was contemporarily making to doctors, the ALJ had a duty to resolve that inconsistency. And that's exactly what the ALJ did here. Your Honors, in closing, I'd like to address that the ALJ accepted the opinions from the State Agency Reviewing Physicians. Other than one environmental restriction, the ALJ's restrictions were actually greater than those of doctors. And nothing that Mr. Bakke has raised would call into question the substantial evidence underlying the ALJ's decision. For those reasons, if Your Honors have no further questions, the Acting Commissioner will rest on her brief. Okay. Ms. Cohen, thank you very much. Thank you, Your Honors. Mr. Duncan, you had some time left. Thank you. The ALJ relied on the State Agency Physicians who never reviewed the myelogram. And the only doctor who really has provided any assessment in this record of what that myelogram is and what it means was Dr. Peterson. And while the government, while the Commissioner argues that the ALJ did address the myelogram on page 22, I'm looking through there. I mean, these are fairly significant findings on that myelogram. Why would, if the judge is really considering these, why would you not have put them in there? Why would you not state why you think these aren't important? Instead, we're kind of left to guess. And as this Court said in Moon, if you have to scour the record to find justification for the ALJ's opinion, you reverse. And as far as the rest goes, yeah, there were times where he felt good. People have good days and bad days. He's not working. He's taking pain medication. He doesn't have the demands associated with work. And as far as what the restrictions are, I mean, I can tell you right now from experience, a sit-stand option at will for somebody limited to light or sedentary work generally will be described as unemployable by a vocational expert because work requires you to be at a position long enough to perform the tasks. And if on a bad day, Mr. Bakke can't stand at a photocopying machine for more than two minutes and he's got a whole project to do in this office helper situation, he's not going to remain employable. So, Mr. Duncan, you've got a lot of experience in this area. When we see sit-stand limitations, they tend not to be associated with light work. They're with other kinds of work. It's on top of it. Light and sedentary work is described in the regulations and in the Social Security rulings. Light is six hours standing, at least six hours sitting. Sedentary is no more than two hours of standing or three hours, approximately one-third of the day, and six hours of sitting. And where you talk about a sit-stand option is that you have the ability to go up and down. Yeah, just kind of layer it on top of that. And if you're in a sit-stand option automatically, you're going to potentially not be able to do a light job because you may end up having to sit more than the six hours for a light occupation. And as a result, that's the problem we have in this. So your point is that when VEs tend not to testify, yeah, you're fully employable with a flexible sit-stand option on top of light work. You don't see that? Not very often. Okay. And if it was, I would be challenging it. So thank you. Okay, very well. Thanks to both parties. We'll take the appeal under advisement.